UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOMINIC ANCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 10 C 4275 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| ACCO BRANDS USA LLC | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Dominic Anco filed a one count complaint against his former employer, ACCO Brands USA LLC ("ACCO"),[1] in the Circuit Court of Cook County alleging that ACCO breached a November 30, 2009 agreement by prematurely discontinuing Anco's severance benefits. ACCO removed the case to this court under 28 U.S.C. § 1441(b) on the basis that Anco's state law breach of contract claim was completely preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq.*, and that federal question jurisdiction was proper under 28 U.S.C. § 1331. This court agreed and denied Anco's motion to remand. [Dkt. #12.] ACCO has now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. [Dkt. #30.] For the reasons set forth herein, ACCO's motion is granted.[2]

---

[1] Anco improperly pleaded "ACCO Brands, a Delaware Corporation," as the defendant in this case. The correct entity is ACCO Brands USA LLC.

[2] The court's jurisdiction is based on sections 502(e)(1) and (2) of ERISA, as amended, 29 U.S.C. §§ 1132(e)(1) and (2); and 28 U.S.C. § 1331 (federal question). Venue is proper pursuant to section

1

## BACKGROUND[3]

ACCO is a supplier of office products. (Def.'s SoF ¶ 5.) On February 16, 1981, ACCO hired Anco as a Maintenance Foreman. (*Id.* ¶ 6.) Anco's employment ended on July 7, 2006 and he received a severance package totaling approximately $54,169.96, which represented eight months of severance pay. (*Id.*) His benefits were based in part on his February 16, 1981 hire date. (*Id.*) On September 17, 2007, ACCO rehired Anco as a Manufacturing Engineering Supervisor. (*Id.* ¶ 7; Def.'s Ex. 7.) He received an annual salary of $85,000, a signing bonus of $5,000, and was eligible to participate in ACCO's benefit programs. (*Id.*)

On May 4, 2009, ACCO informed Anco that it was closing its manufacturing facility and that he would be permanently laid off on December 31, 2009, or within 14 days thereafter. (*Id.* ¶ 8; Def.'s Ex. 9.) On the same day, ACCO sent Anco a personalized estimated severance benefits statement ("Estimate of Benefits"). (Def.'s SoF ¶ 8; Def.'s Ex. 10.) The Estimate of Benefits stated that "[t]he intent of this letter is to provide you an estimate of your severance benefit under the ACCO Brands Severance Plan and Summary Plan Description effective February 12, 2009 [("the Severance Plan")] . . . [and] [o]nly the Plan itself should be relied on for any actual severance coverage, eligibility requirements, benefits calculations and other questions." (Def.'s Ex. 9.) The Estimate of Benefits directed Anco to a human resources website where he could access the Severance Plan, and stated, "According to the Plan . . . your severance benefit would be based on your salary grade, years of service based on your most recent hire date, and your current base salary." (*Id.*) The Severance Plan similarly stated, "The

---

502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(a) and (b).

[3] The following facts are undisputed except as noted in footnote 5 and taken from the parties' Local Rule 56.1 statements of facts. [Def.'s SoF Dkt. #32 & Pl.'s SoF Dkt. #41.]

amount of severance benefit payments for covered eligible employees will be calculated . . . based on salary grades and years of service . . . . Years of service will be measured only from an employee's most recent date of hire." (Def.'s Ex. 10 Attachment A.) According to the Estimate of Benefits, Anco was entitled to receive approximately $10,190.19 (representing six weeks of salary), six weeks of subsidized medical and dental benefits, and three months of outpatient services pursuant to the Severance Plan. (Def.'s SoF ¶ 9; Def.'s Ex. 9.)

On September 21, 2009, ACCO sent Anco a letter notifying him that he would be permanently laid off on November 30, 2009, or within 14 days thereafter. (Def.'s SoF ¶ 11; Def.'s Ex. 13.) On November 30, 2009, ACCO gave Anco a copy of a Letter Agreement along with a confidential waiver agreement, a general release, and a copy of the Severance Plan. (Def.'s SoF ¶ 12; Def.'s Ex. 14 & 15.) The Letter Agreement stated that "[s]everance benefits are governed by the terms of the ACCO Brands Severance Plan . . . and will be paid only in accordance with the Severance Plan." (Def.'s Ex. 14.) It also stated that Anco would receive 26 weeks of severance pay at his bi-weekly rate of $3,396.73, for a total severance benefit of $44,157.49, and 26 weeks of subsidized medical and dental benefits. (Def.'s SoF ¶ 12; Def.'s Ex. 14.) This amount was $33,967.30 more than the amount listed in his Estimate of Benefits. (*See* Def.'s Ex. 9.) Anco signed the Letter Agreement and executed the waiver and general release. (Def.'s Ex. 14 & 15.)

On December 11, 2009, Anco received his first severance payment of $3,057.05. (Def.'s SoF ¶ 13.) ACCO also subsidized the cost of Anco's medical and dental coverage from

December 1, 2009 through January 10, 2010. (*Id.*)[4] Four days later, during an internal audit, ACCO discovered that the Letter Agreement did not accurately reflect the amount of benefits that Anco was entitled to under the Severance Plan. (Def.'s SoF ¶ 14.)[5] ACCO had mistakenly relied on Anco's original date of hire (February 16, 1981) to calculate his benefits, not his most recent date of hire (September 17, 2007) as required by the Severance Plan. (*Id.*) That same day, ACCO's representatives called Anco and informed him that (1) there was an error in the Letter Agreement; (2) ACCO would be sending him a revised letter agreement and a waiver and release with the correct severance benefit amount; and (3) his severance payments would cease until ACCO received the executed revised documents. (*Id.* ¶ 15.) The next day, ACCO sent Anco a Revised Letter Agreement, a waiver and a release via overnight delivery. (*Id.* ¶ 16.) Anco signed for the delivery but declined to execute the Revised Letter Agreement. (*Id.*) He then filed this lawsuit seeking to enforce the Letter Agreement.

## LEGAL STANDARD

---

[4] In December 2009, Anco received a medical subsidy of $751.40 and a dental subsidy of $72.72. (Def.'s SoF ¶ 13.) In January 2010, Anco received a medical subsidy of $305.95 and a dental subsidy of $24.24. (*Id.*)

[5] Employee Relations Specialist Lisa Waldman testified to this fact and others in an affidavit attached to ACCO's Local Rule 56.1 statement of facts. (Dkt. #41, Pl.'s SoF ¶ 3.) Anco disputes this fact and others, stating that he was "not privy" to the information contained in Waldman's affidavit. (Pl.'s SoF at 2.) This denial is insufficient under the Local Rules. Anco does not dispute that Waldman possesses personal knowledge concerning the receipt of Anco's severance benefits. *See Malec* v. *Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("affidavits must be made on personal knowledge" (citations omitted)). Nor does he support his general denial with citations to the record. *See Buttron* v. *Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *4 (N.D. Ill. Aug. 4, 2003) ("[T]he [denying] party must provide 'specific references' to the material that shows that a factual disagreement exists." (quoting L.R. 56.1(b)(3)(A))). As such, the court will accept the facts contained in paragraphs 14 and 16 of ACCO's Local Rule 56.1 statement of facts as uncontested.

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id.* While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). "When there are no triable issues of fact . . . contract interpretation is a subject particularly suited to disposition by summary judgment." *Hickey* v. *A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (internal quotation marks and citation omitted). "However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder must be called upon to determine the intent of the parties." *Bock* v. *Computer Assocs. Int'l, Inc.*, No. 99 C 5967, 2000 WL 310288, at *5 (N.D. Ill. Mar. 24, 2000) (citation omitted) (*Bock I*), *rev'd* 257 F.3d 700 (7th Cir. 2001) (*Bock II*).

**ANALYSIS**

This court previously ruled that Anco's breach of contract claim was preempted by ERISA because interpretation of the Letter Agreement necessarily required reference to the Severance Plan, which is an ERISA-qualified plan. (Dkt. #12.)[6] As such, Anco's claim for benefits is analyzed as one brought under ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). *See New* v. *Verizon Commc'n*, 635 F. Supp. 2d 773, 782 (N.D. Ill. 2008) ("[W]here a claimant seeks to recover severance benefits under a company's ERISA plan, § 502(a) of ERISA is the claimant's sole method of relief." (citing *Bowles* v. *Quantum Chem. Co.*, 266 F.3d 622, 630–33 (7th Cir. 2001)). The court will "focus on traditional contract principles in light of ERISA-specific concerns" in resolving Anco's claim. *Young* v. *Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009) (*Young I*), *aff'd* 615 F.3d 808 (7th Cir. 2010) (*Young II*). These principles "are not those of any particular state's contract law, but rather are a body of federal common law tailored to the policies of ERISA." *Mathews* v. *Sears Pension Plan*, 144 F.3d 461, 465 (7th Cir. 1998) (citations omitted).

---

[6] Anco again argues that this court lacks subject matter jurisdiction over his claim, *see* Anco Resp. at 24–26, but this court previously considered and rejected his argument. *See* Dkt. #12 ("Because the Severance Plan governs the benefits to which Anco is entitled per the Letter Agreement, the court would have to look to the terms of the Severance Plan to determine whether the Letter Agreement was breached."). Of the cases Anco cites in his brief, only three are binding on this court. *See Fort Halifax Packaging Co., Inc.* v. *Coyne*, 482 U.S. 1, 107 S. Ct. 2211, 96 L. Ed. 2d 1 (1987); *Bowles* v. *Quantum Chem. Co.*, 266 F.3d 622, 631 (7th Cir. 2002); *Collins* v. *Ralston Purina Co.*, 147 F.3d 592, 603 (7th Cir. 1998) (citing Judge Rovner's dissenting opinion). These cases support this court's previous holding that Anco's claim is pre-empted by ERISA. Here, as in *Bowles* and *Collins* and unlike in *Fort Halifax*, ACCO could not satisfy its obligations under the Severance Plan by cutting a single check and making a single set of payments to all of its covered employees at one time. Rather, ACCO was faced with the prospect of multiple payments to various employees at different times and under different circumstances. This is sufficient for purposes of ERISA preemption. *See Fort Halifax Packaging Co., Inc*, 482 U.S. at 11–12 (holding that a state statute requiring a one-time severance payment to terminated workers was not preempted by ERISA); *Bowles*, 266 F.3d at 631–32 (holding that a severance plan that required the employer to budget for the possibility of multiple payments throughout the course of a year was preempted by ERISA); *Collins*, 147 F.3d at 597 (concluding that because the plan required the employer to make nonclerical judgment calls on multiple occasions, an ongoing administrative scheme existed.)

ACCO urges the court to use an "abuse of discretion" standard to review ACCO's determination, citing *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989) ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.") This is not an administrative review situation in which the administrator has exercised discretion in interpreting the terms of the plan and applied them to facts as it found them. Rather, the court is making an independent decision as to what the Letter Agreement means. *See Krolnik* v. *Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009) ("[L]itigation under ERISA by plan participants seeking benefits should be conducted just like contract litigation, for the plan and any insurance policy are contracts. In a contract suit the judge does not 'review' either party's decision. Instead the court takes evidence (if there is a dispute about a material fact) and makes an independent decision about how the language of the contract applies to those facts."). This court will proceed accordingly.

The issues presented are whether the severance pay contained in the Letter Agreement, which is based on Anco's original date of hire rather than most recent date of hire as provided in the Severance Plan, reflects the intent of the parties and, if not, what to do about it. ACCO asks the court to reform the contract by characterizing the Letter Agreement as having merely a scrivener's error. *See Young I*, 667 F. Supp. 2d at 894 ("The contract law doctrine of 'scrivener's error,' or mutual mistake, allows a court of equity to reform a contract where a written agreement does not reflect the clear intent of the parties due to a drafting error"); (citing 27 WILLISTON ON CONTRACTS § 70:93 (4th ed.)); WILLISTON, *id*. ("[A] scrivener's error . . .

7

occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error."); RESTATEMENT (2D) CONTRACTS § 152 (1981). ("(1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154[;[7]] (2) [i]n determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.").[8]

Anco argues that there was no scrivener's error or mutual mistake because he understood the agreement as one providing him 26 weeks of severance pay, not the six set out in the Revised Letter Agreement. Anco refers to the careful review ACCO's representative made of the agreement before Anco signed it and his own expectation that it would be a little more than 26 weeks based on recent service he had provided to ACCO.[9] Rather, he argues, if it was a mistake,

---

[7] "Whether the agreement places the risk on the mistaken party is a question to be answered under the rules generally applicable to the scope of contractual obligations, including those on interpretation, usage and unconscionability." RESTATEMENT (2D) CONTRACTS § 154, cmt. b (1981).

[8] Anco contends that reformation of contract is an equitable claim that ACCO should have sought by way of a counterclaim. Federal courts do not require parties to plead causes of action, however, and there is precedent in the common law for asserting mutual mistake of fact as an affirmative defense, as ACCO has done here. *E.g.*, *Harris N.A.* v. *Acadia Invs. L.C.*, No. 09 CV 666, 2010 WL 4781458, at *5 (N.D Ill. Nov. 16, 2010); *see* RESTATEMENT (1ST) CONTRACTS § 507 (1932) ("Where circumstances justify reformation of a writing, affecting the contractual relations of the parties to the writing, a court may in its discretion without a preliminary decree of reformation give effect to the transaction as if it had been reformed.").

[9] Anco testified, "I spent a lot or time at ACCO, and especially on this last project, I spent four months in Mexico straight through and came home once every three weeks for a weekend. I thought that was probably part of the compensation package." (Anco. Dep. at 29.) He testified that he had asked previously for a $25,000 retention bonus, but ACCO awarded him $15,000 instead. (*Id.*; *see also* Def.'s SoF ¶ 10; Def.'s Ex. 12.). Anco received the full $15,000 minus applicable withholdings prior to his termination. (Def.'s SoF ¶ 10.)

it was ACCO's unilateral mistake.

The essence of this dispute is not a failure in the Severance Plan to set out the actual terms intended. Rather, the Letter Agreement simply fails to reflect the correct payout under the Severance Plan. As such, it is unlike the cited cases that discuss errors (scrivener's or otherwise) in benefit plans that affect all members of the plan and thus concern broad policy issues.[10] Here, one member is affected (if we disregard any impact on the financial soundness of the Plan) and policy issues are less important. General contract principles are sufficient to resolve the case. Nonetheless, the court's inquiry is guided by federal common law arising from ERISA. *Young I*, 667 F. Supp. 2d at 885.

Under general contract principles, "[t]he mutual v. unilateral mistake distinction is an important one in a reformation analysis, as courts have been 'reluctant to allow a party to avoid a contract on the ground of [unilateral] mistake, even as to a basic assumption, if the mistake was not shared by the other party.'") *Id*. at 896 (quoting RESTATEMENT (2D) CONTRACTS § 153 cmt. a (1981)). Even analyzed under principles of unilateral mistake as Anco urges, the law points to resolution in favor of ACCO. The Restatement uses the following rule when a mistake of one party makes a contract voidable:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him

---

[10] For example, as explained in *Young I*, "the Court must consider that an absolute bar on reformation of a drafting error could have the effect of discouraging employers from establishing and maintaining employee benefit plans. The Supreme Court has pointed out that employers are under no obligation to provide employee benefit plans, nor what kind of benefits to provide if they do choose to establish a plan." 667 F. Supp. 2d at 900 (citing *Lockheed Corp.* v. *Spink,* 517 U.S. 882, 887, 116 S. Ct. 1783, 135 L. Ed. 2d 153 (1996)).

if he does not bear the risk of the mistake under the rule stated in § 154,[11] and

> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party ha reason to know of the mistake or his fault caused the mistake.

RESTATEMENT (2D) CONTRACTS § 153 (1981); *see S.T.S. Transport Service, Inc.* v. *Volvo White Truck Corp.*, 766 F.2d 1089, 1093 (7th Cir. 1985) ("As [Illinois] law now stands, three conditions must be fulfilled before a contract can be rescinded: (1) the mistake must relate to a material feature of the contract; (2) it must have occurred despite the exercise of reasonable care; and (3) the other party must be placed in the position it was in before the contract was made.").

Under the Restatement, ACCO made a mistake as to the reference date for calculating Anco's severance pay. This had a material effect on the agreed exchange of performance that is adverse to ACCO. The contract is voidable by ACCO if he does not bear the risk of the mistake (It does not. *See* footnote 11), and the other party had reason to know of the mistake. The only permissible inference under the facts is that Anco had good reason to know of the mistake. Indeed, the Letter Agreement is ambiguous on its face. It explicitly states that benefits will be paid only in accordance with the Severance Plan, yet the calculation is contrary to the Plan. In other words, it says one thing but does another. In this situation, the court must look to objective

---

[11] A party bears the risk of a mistake when

> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

RESTATEMENT (2D) CONTRACTS § 154 (1981). None of these factors would place the risk of mistake on ACCO.

extrinsic evidence to determine the parties' intent.

First, the Letter Agreement identifies the payment as severance pay that is calculated according to the formula provided in the Severance Plan (albeit based on the wrong hire date). It expressly incorporates the Severance Plan, which provides that the amount of severance benefit payments are to be measured only from an employee's most recent date of hire. (Def.'s Ex. 10 Attachment A; Def.'s Ex. 14.) (Tellingly, Anco does not dispute that the Severance Plan required his benefits to be calculated in this manner.)[12] In addition, six months prior to Anco's termination, ACCO issued the Estimate of Benefits, which stated that Anco's severance package would be calculated based on his most recent hire date. (*See* Def.'s Ex. 12.) Like the Letter Agreement, the Estimate of Benefits expressly incorporated the terms of the Severance Plan. (*Id.*) It also told Anco that "[o]nly the Plan itself should be relied on for any actual severance coverage." (*Id.*) Anco did not dispute his benefit amount at that time, and the terms of the Severance Plan remained unchanged throughout the duration of his employment. Moreover, Anco played no part in negotiating or drafting the Letter Agreement such that there might be a dispute as to what the parties actually intended. Anco merely testified to his subjective understanding that he would receive 26 weeks of benefits as payment for extra services because he asked for extra compensation at some unspecified time (and had received extra compensation of $15,000). He can point to no evidence that ACCO ever agreed to pay him any severance compensation beyond that provided under the Severance Plan. Having received the earlier Estimate of Benefits, having previously received severance pay based on his first date of hire

---

[12] Anco argues that the Letter Agreement did not incorporate the terms of Severance Plan and instead constituted "an independent, complete, clear and unambiguous document" that is not subject to ERISA. The court previously rejected this argument and will not reconsider it here. (*See* Dkt. #12.)

after his separation in July 2006, having been advised in the Letter Agreement that severance could be paid only in compliance with the Severance Plan's terms, Anco certainly had reason to believe that a mistake in his favor had been made.[13]

In addition, enforcing the error would result in a windfall to Anco. *See, e.g., Young I*, 667 F. Supp. 2d at 899 ("[C]ourts do not look favorably on attempts to obtain windfall recoveries under ERISA plans.") (collecting cases). Under the Letter Agreement, Anco was scheduled to receive four times the cash amount he was entitled to under the Severance Plan, plus benefits for a much longer period. Moreover, if the court were to enforce the erroneous calculation, Anco would receive double benefits for the dates of his original employment, February 16, 1981 through July 7, 2006. Further, the Letter Agreement provided Anco with benefits for the interim period from July 8, 2006 through September 16, 2007 while he was not even an ACCO employee. *See Air Line Pilots Ass'n* v. *Shuttle, Inc.,* 55 F. Supp. 2d 47, 53 (D.D.C. 1999) (finding a windfall where a scrivener's error would result in plan participants receiving $2500 more per month in disability benefits than they would have otherwise received); *see also Int'l Union of Electronic, Elec., Salaried, Mach. & Furniture Workers, AFL-CIO* v. *Murata*, 980 F.2d 889, 907 (3d Cir. 1992) (acknowledging that "the alleged error relates to what is admittedly a 'windfall' for either [defendant] or plaintiffs–an excess remaining in the Plans that neither side could have reasonably expected," but remanding for consideration of other disputed facts).[14]

---

[13] Moreover, this court has little doubt that if ACCO had mistakenly underpaid Anco his severance benefits under the Severance Plan, then ACCO would have promptly corrected its error rather than relying on Anco's signature as binding him to receive less than his entitlement under the Severance Plan.

[14] Anco attempts to distinguish these cases by arguing that "when those Courts discussed a windfall, it was limited to the context of all participants being affected by a windfall. That is clearly not the case presented here." (Anco's Resp. at 23.) The equities involved in both situations, however, are

Citing *S.T.S. Transport Service, Inc.* v. *Volvo White Truck Corp.*, 766 F.2d 1089, 1093 (7th Cir. 1984),[15] Anco argues that the contract should be enforced because he "clearly relied" on the Letter Agreement when he agreed to release his rights pursuant to the confidential waiver agreement and general release. (Anco Resp. at 16, 18.) ACCO, on the other hand, argues that Anco could not have possibly relied on the erroneous term because it notified him of the mistake promptly after issuing his first severance payment. (ACCO Mot. Summ. J. at 14.) Lifting language from *S.T.S. Transport Services, Inc.* without analyzing the import of it, Anco omits the court's statement that "Illinois courts will generally grant relief for errors 'which are clerical or mathematical,'" *Id*. at 1093 (quoting *Cummings* v. *Dusenbury*, 472 N.E.2d 575, 579, 129 Ill. App. 3d 338, 84 Ill. Dec. 615 (1984)). The elements of proof in that case are similar to the Restatement and also met here: (1) the mistake was material; (2) it occurred despite the exercise of reasonable care; and (3) the other party can be placed in the position it was in before the contract was made. As that court put it, "[t]he question of reliance is no different from the question whether the parties can be put into the position they were in at the time the contract was signed." *Id.* at 1094. There is no impediment to doing just that here, where the mistake was discovered after the first monthly payment was made.

The reality is that "[p]eople make mistakes. Even administrators of ERISA plans." *Young II*, 615 F.3d at 812 (quoting *Conkright* v. *Frommert*, --- U.S. ----, ----, 130 S. Ct. 1640,

---

similar. Regardless of whether the error affects one or one hundred, the court must balance the preference for enforcing the written word against need for fairness and accuracy.

[15] "Naturally there are cases of extreme negligence to which this presumption should not apply; and there is an exception of sorts where the contract has been relied upon." *S.T.S. Trans. Serv., Inc.*, 766 F.2d at 1093.

1644, 176 L. Ed. 2d 469 (2010)). In short, the court concludes that there is no genuine issue of material fact and that ACCO has met its burden to justify reformation of the contract as a matter of law. Anco is entitled that which is owed him under the Severance Plan, no more and no less.

**ORDER**

For the foregoing reasons, defendant ACCO Brands USA LLC's motion for summary judgment [Dkt. #30] is granted. The Clerk is directed to enter judgment is entered in favor of ACCO Brands USA, LLC and against plaintiff Dominic Anco.

Dated: March 7, 2012                    Enter: _____
                                               JOAN HUMPHREY LEFKOW
                                               United States District Judge